## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

STEVEN PUNSKY,              )
                              )
              Plaintiff,      )
                              )
v.                            )  Docket No. 2:19-cv-00235-NT
                              )
CITY OF PORTLAND, et al.,    )
                              )
              Defendants.   )

## ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Before me is the Defendants' motion for summary judgment ("**Defs.' Mot.**") (ECF No. 53). For the reasons stated below, the motion is **GRANTED**.

## FACTUAL BACKGROUND[1]

Shortly before 9:00 pm on December 31, 2017, the Portland Police Department ("**PPD**") received a call about an altercation at 35 Motley Street (the "**residence**"). It

---

[1]     The following background is drawn from the Defendants' statement of facts ("**DSOF**") (ECF No. 54) and the Plaintiff's separately-numbered additional statement of facts ("**PSOF**") (ECF No. 56), which are consolidated in a single document that includes responses and requests to strike. Reply Statement of Facts (ECF No. 63).

     I also rely on videos that were taken from equipment possessed by three of the responding officers. Exhibit 1 to Officer Darrel Gibson's affidavit (the "**Gibson Recording**") (ECF No. 52-17) is an audiovisual recording. The camera appears to be mounted on the police cruiser and does not provide a visual depiction of what happened until the end of the encounter. However, a microphone that presumably was worn by Officer Gibson captured audio of many of the relevant events. Exhibit 1 to Officer Kimberly Donnell's affidavit (the "**Donnell Recording**") (ECF No. 52-15) is also an audiovisual recording. As with the Gibson Recording, the camera appears to be mounted on a police cruiser, and it does not provide video of what happened in and around 35 Motley Street (the "**residence**"). However, a microphone that was presumably worn by Officer Donnell captured audio of many of the relevant events. Finally, it appears that Officer Jonathan Lackee's taser had a recording device that activated when his taser was drawn. There are three recordings from the periods in which the taser was drawn, which I refer to individually as "Taser Video 1" (ECF No. 59-1), "Taser Video 2" (ECF No. 59-2), or "Taser Video 3" (ECF No. 59-3), and collectively as the "Taser Videos." I "view[ ] the facts in the light depicted by the" recordings. *Scott v. Harris*, 550 U.S. 372, 381 (2007). But where there is no recording or where the video or audio evidence is inconclusive, I view the facts "in the light most favorable to the nonmoving party." *Id.* at 380.

was an extremely cold night—around zero degrees Fahrenheit at 9:00 pm—with snow on the ground. PPD officers Kimberly Donnell, Jonathan Lackee, and Darrel Gibson—all Defendants in this case—responded to the call.

Officer Gibson's recording reveals that as the officers are en route to the residence, dispatch informs them that someone at the residence was known to possess firearms; that the occupants of the residence—the Plaintiff Steven Punsky and his son Mitchell[2]—have both been drinking; and that they are currently wrestling on the floor.

Gwendolyn Punsky, Steven's wife, meets the officers outside and informs them that Steven and Mitchell are inside fighting. As the officers open the door to the residence, they observe Steven lying on the kitchen floor with Mitchell on top of him, holding Steven down. Officer Lackee tells Steven and Mitchell to stop and tells

---

The Plaintiff objects to one of the Defendants' statements of fact, *see* Pl.'s Resp. to DSOF ¶ 30 (ECF No. 56), while the Defendants request to strike or disregard several of the Plaintiff's statements of fact, *see* Defs.' Resp. to PSOF ¶¶ 3, 5–6, 9–10, 14, 16, 19–20, 23–25, 27 (ECF No. 63). I need not address the Plaintiff's objection because I do not rely on the statement of fact that he seeks to strike. As for the Defendants' requests to strike, most relate to the Defendants' contention that the Plaintiff has at times improperly relied on legal argument in the PSOF. I agree that the Plaintiff has gone beyond outlining the facts material to his claims and has improperly injected legal argument into the PSOF. I have disregarded all of this argument. The Defendants also allege that the Plaintiff has failed to provide specific citations in support of his PSOF in violation of Local Rules 56(c) and 56(f). I agree that some of the Plaintiff's citations are inadequate, and I have disregarded the parts of the PSOF that are not sufficiently supported by the record. But sometimes the Plaintiff cites to the whole of a video, which I do not consider to be necessarily improper. For example, it seems logical to cite to the Taser Videos in their entirety sometimes, given that they are very short and that the PSOF at times makes statements about Steven's interactions with the police as a whole rather than at a specific point in time. The only request to strike that the Defendants make that is not based on improper legal argument or inadequate citation pertains to PSOF ¶ 3, which the Defendants contend is an improper opinion. I do not consider this fact to be relevant to my analysis, so I need not decide the propriety of that request to strike.

[2]   Since the three occupants of the residence all share the same last name, I refer to them by their first names to avoid confusion.

Mitchell to get up. Mitchell quickly complies, retreats deeper into the kitchen, kneels, and puts his hands on his head.

As Mitchell is moving away, Officer Lackee says, "You're both gonna stop or you're gonna get tased, okay?" Steven, who is estimated to be 6'3" tall and 360 pounds, is kneeling facing the officers. He has a cut on his face and is bleeding from his nose. He wags his finger and says, "You tase me, it's the worst mistake of your life . . . . You understand that?" Officer Lackee tells Steven that he needs to cooperate, and Steven says, "Oh, really?" and quickly lunges to his right behind a counter. Officer Lackee shouts, "Stop! Get back!" He tells Steven to get on the floor. Steven is told again to lie down on the floor, and he responds, "I'm not laying on the floor in my own house." Again wagging his finger at Officer Lackee, Steven says, "You tase me, I am fucking coming for you." Officer Lackee tells Steven, "We don't want to do that. That's the last thing we want to do."

For the next two minutes or so, the officers attempt to get Steven to lie on the floor. He tells them alternatively that he cannot because he is hurt and disabled or that he will not because "this is my house." They explain to him that it is necessary for officer safety. For most of the encounter in the kitchen, Steven is kneeling with his hands between his legs. He tells the officers that he will get on all fours, but that is the most he will give them. He will not lie on the floor. Steven repeatedly tells the officers to come in, and he says that they will not be harmed.

About three minutes into the encounter, one of the officers steps into the kitchen. The officers tell Steven to move over to the left, but, instead, Steven

3

responds, "You point that fucking thing near me . . . ," and one of the officers counters, "Please, I am trying to work with you." An officer shouts, "Get your hands out of your pockets. Out of your pockets." Steven responds, "You want to play games?" And an officer responds, "We don't want to play games." At about this point, a large dog walks through the kitchen, and Officer Donnell warns, "Dog coming at you." As the dog walks into the line of fire for the taser, Steven says, "If you hurt that dog, I will probably kill you."

Shortly after this, an officer tells Steven that they need to put him in handcuffs, and Steven resists that suggestion. There is more back and forth banter with Steven accusing the officers of playing games and the officers pleading with Steven to cooperate. Steven tells the police: "I went to the academy. I know the whole fucking rules." An officer responds that Steven should understand then why they are doing what they are doing. At one point, Steven tells the officers: "You better let go of me in my own house."

About five minutes into the encounter, Lieutenant Kevin Cashman (who has just responded to the scene) tries a new approach. He says, "Let me talk to him a moment, alright? I'm gonna have you stand up and walk outside and talk with me. Fair enough?" Steven—wearing socks, a long sleeve shirt, and shorts—gets up and walks outside with Lieutenant Cashman. Officer Lackee follows, while Officers Gibson and Donnell remain inside to interview Gwendolyn and Mitchell.[3] Shortly

---

[3]     Mitchell reports that Steven had been going through a lot of mental and emotional trauma over the last few months pertaining to the use of opiates. Gwendolyn confirms that there are firearms in the house and tells the officers that Steven has been drinking. Mitchell tearfully tells the officers that he was trying to defend his mother after Steven got in her face. Mitchell states that Steven came

after Officer Lackee steps out into the cold, outside air, Taser Video 1 ends, the taser having apparently been resheathed.

Within one minute of Steven stepping outside, the officers offer him footwear.[4] About eight minutes after Steven goes outside, Officer Gibson finishes his interview of Gwendolyn and Mitchell and goes outside, and the audio recording of Steven resumes. Steven continues to berate the officers.

Approximately nine and a half minutes after he is taken outside (and about fifteen minutes into the encounter), Steven is evaluated by a paramedic. When asked if he hit his head, Steven tells the paramedic that he did, but he is fine. The paramedic manipulates some parts of Steven's body and asks if he feels any pain, and Steven responds, "No, none whatsoever." When asked whether he had any tingling in his arms or legs, Steven first says no. He later explains to the paramedic that he has

---

at him swinging and that he hit his father twice in the face because he feared for his own safety and that of his mother. Mitchell says that he then managed to hold his father down until the police arrived.

[4]      The Plaintiff denies this fact (DSOF ¶ 18) on three grounds. First, he raises a spoliation argument. There is no recording of what happened for the first eight minutes that Steven is outside with Lieutenant Cashman and Officer Lackee, and the Plaintiff contends that the lack of audio may indicate spoliation. Pl's Opp'n to Defs.' Mot. for Summ. J. ("**Pl's Opp'n**") 4–5 (ECF No. 55). But the Plaintiff has offered no evidence of spoliation, and he points to nothing in the record to suggest that Lieutenant Cashman or Officer Lackee were wearing body mics that were faulty or that any portion of a recording was missing. The lack of video for these eight minutes is explained by the facts that Officer Lackee had sheathed his taser and that Officers Gibson and Donnell (who were wearing body mics) stayed inside to interview Mitchell and Gwendolyn after Steven was escorted outside. The spoliation argument is unsupported and rejected.

Second, the Plaintiff claims that "Officer Lackee's recollection is too vague to prove this fact definitively." Pl.'s Resp. to DSOF ¶ 18. However, the record citation to Officer Lackee's deposition fully supports DSOF ¶ 18, and there is nothing vague about Officer Lackee's recollection. Officer Lackee was clear that Steven was offered footwear "nearly immediately" after he exited the house. Dep. of Jonathan Lackee ("**Lackee Dep.**") 40:23–41:16. Officer Lackee's only equivocation was as to whether that offer was made as Steven was walking out the door or within the first minute of him exiting the house. Lackee Dep. 41:7–16.

Finally, the Plaintiff attempts to qualify DSOF ¶ 18 by stating that there is no evidence that the shoes offered to Steven actually fit him. While that may be true, it is not a denial of the fact as posited by the Defendants. Accordingly, I deem this fact admitted.

cancer in various vertebrae, that he has had tingling in his arms for years, and that he sometimes wakes up at night and cannot feel his arms. The paramedic asks Steven questions to elicit whether he is oriented to place and time, and Steven begins joking with the paramedic.[5]

During the examination by the paramedic, one of the officers asks Steven whether he wants him to grab him some shoes. The paramedic adds, "Yeah, you are probably getting cold right now." In response, Steven says, "I don't care. No, I don't want the shoes. I don't want anything." The paramedic also asks Steven if he wants to go to the hospital and he responds, "I'm fine." The paramedic offers to take Steven to the ambulance to continue the evaluation, and Steven declines, again indicating that he is fine. The paramedic offers that "we have stuff in our junk here too." I understand these comments, in context, to be an offer to get something to keep Steven warm. Steven responds, "I'm fine. I'm fine. Listen, I'm fine. I promise you I'm fine. If I wasn't fine . . . I am probably going to go to the hospital tomorrow because I can't stand this fucking pain [in my back]." Steven then explains that they took his pain medication away that he had been on for thirty years.

After being seen by the paramedic, Steven seems to think he is going to be allowed back into the house, and he begins to move in that direction. The officers, who by this time are planning to arrest Steven, tell him to back up. The taser is again

---

[5]    The Plaintiff asserts that Steven answered one of these orienting questions incorrectly but does not specify to what exactly he is referring. I have listened to the interaction between Steven and the paramedic, and it is not clear to me that this is accurate. What I hear is Steven correctly answering some of the paramedic's questions and then joking around with him in response to others. There does not appear to be any sign of disorientation.

unsheathed. Steven continues to berate the officers, primarily about the taser. He again tells them that tasing him would "be the worst fucking mistake of your life." He also threatens the officers' jobs, telling them that they are not going to be police officers the next morning and that they "blew it," sarcastically telling them, "Sorry you lost your career."

At some point, the police make the determination that they will need an arrest wagon to transport Steven, rather than place him in the back of one of their cruisers. After Steven is in handcuffs and placed under arrest, a cruiser (presumably Officer Gibson's because the video appears on the Gibson recording) is brought down toward the residence, and Steven is moved up toward the cruiser. As he stands next to the cruiser, an officer comes up with a pair of shoes and sets them on the hood of the car. Steven is again asked whether he wants to put the shoes on, and he declines. The Plaintiff now claims (in PSOF ¶ 21) that the sneakers that he was offered were his son's shoes and were too small for him. However, he does not contend in the PSOF that he ever told the officers this, and the recordings do not reflect that he did.

When he realizes that he is not going to be put into the cruiser but must wait for the arrest wagon, Steven complains to Officer Gibson: "So I gotta sit here with stocking feet?" Officer Gibson responds: "You don't have to have stocking feet. We've asked you if you wanted sneakers five times now." Steven snaps back: "You know what? You can keep your fucking mouth shut. That's all you need to do." Officer Donnell asks him one more time if he would like to put his sneakers on, and he does not respond to her.

Steven then complains about why he is not getting into the cruiser, and the police explain that they have called for a larger vehicle. Steven asks if that is because he is fat, and Officer Donnell tells him that it is because he has been aggressive. Another officer tells him that it is because of his "demeanor and [his] attitude."[6] Once Steven is loaded into the arrest wagon, he is taken to the hospital for an evaluation. Once medically cleared at the hospital, he is taken to the jail for booking.

By matching up the recordings I am able to track the passage of time. The first encounter with Steven in the kitchen lasts about five minutes before Lieutenant Cashman asks Steven to go outside with him. Then there is a roughly eight-minute period when Steven is outside with Lieutenant Cashman and Officer Lackee, but no microphone picks up their conversation. After this eight-minute period, Officer Gibson comes outside, and Steven can again be heard on the recording. The evaluation by the paramedic and the second skirmish with the officers takes about ten minutes. Steven is then placed under arrest and handcuffed, and it takes about eight more minutes to get an arrest wagon and load Steven into it. All told, the encounter at the residence lasts approximately thirty-one minutes, and Steven is outside for roughly twenty-six minutes.

In addition to the offers to provide shoes when the officers first removed Steven from the house and while Steven was being seen by the paramedic, the officers can be heard on the recordings at least eight times asking Steven whether he wants shoes.

---

[6]     The Defendants now contend that the arrest wagon was called because of Steven's size. The Plaintiff denies this fact. Taking the facts in the light most favorable to the Plaintiff, I consider the reason for calling the wagon to be that he was being aggressive rather than him being too large.

Sometimes Steven ignores these requests. Sometimes he responds threateningly. Sometimes he outright rejects the offer. The officers contend that they did not force Steven to put on shoes because it would likely have led to a physical altercation with the possibility that officers would be injured.[7]

The Plaintiff objects to the officers having brought Steven out into the cold in the first place, arguing that he should have been permitted to stay inside until the arrest wagon arrived. The Defendants contend that they did not bring Steven back inside of the residence because of concerns for the safety of the officers and the complainants. If they had decided to bring Steven back into the house, security sweeps would have to be performed and the arrest wagon would have arrived before any such sweeps could have been completed.[8]

The officers also did not believe that Steven was bothered by the weather. While the Plaintiff acknowledges that Steven did not complain about pain in his feet or frostbite and that he did not appear to be bothered by the weather, he contends that this could have been attributable to his intoxication and his head injury. Steven contends that the officers should have been aware when he declined the offers of shoes that he was exercising poor judgment and not mentally well.

---

[7]      The Plaintiff denies that he was a physical threat at any point. But the Defendants are explaining their reason for not forcing Steven to put on shoes. Whether he was actually a physical threat and whether they reasonably believed he posed a physical threat are two different things. I deem this fact (DSOF ¶ 47) admitted.

[8]      The Plaintiff denies this fact (DSOF ¶ 54) because he says there is no evidence of this fact in the record. The fact is amply supported by Officer Lackee's testimony about the limited options available to the police that night, their knowledge that the arrest wagon was on the way, and the fact that only about eight minutes passes between the time that Steven is handcuffed and the time he is put into the arrest wagon.

## PROCEDURAL BACKGROUND

The Plaintiff filed his Complaint in state court in March 2019, Compl. (ECF No. 3-3), and filed his First Amended Complaint shortly thereafter, First Am. Compl. (ECF No. 3-4). After the Defendants removed the action to this Court, Notice of Removal (ECF No. 1), the Plaintiff filed a Second Amended Complaint ("**SAC**"), SAC (ECF No. 7).

In August 2020, the Plaintiff moved for leave to amend the SAC. Pl.'s Mot. for Leave to File Third Am. Compl. 1 (ECF No. 27). The Plaintiff sought to make several changes, including renaming and reframing Count I and explicitly mentioning, for the first time, his theory that the Defendants had violated the "special relationship doctrine." Proposed Third Am. Compl. 4–5 (ECF No. 27-1). The Magistrate Judge denied the motion for leave to amend, Order (ECF No. 34), and the Plaintiff did not object.

In February 2021, the Plaintiff again sought leave to amend the SAC. Pl.'s Second Mot. for Leave to File Third Am. Compl. (ECF No. 43). And he again sought to introduce his "special relationship doctrine" theory into his pleading and to rename and recharacterize Count I. Proposed Third Am. Compl. 3 (ECF No. 43-2). In denying this motion, I found that the Plaintiff was attempting "to circumvent the Magistrate Judge's prior order after failing to file" a timely objection and that he had failed to establish the good cause required by Federal Rule of Civil Procedure 16(b). Order 5–6 (ECF No. 46).

The SAC asserts seven claims: "Excessive Force in Violation of the Fourth and Fourteenth Amendment" (Count I), a violation of the Maine Civil Rights Act

("**MCRA**") (Count II), assault (Count III), battery (Count IV), intentional infliction of emotional distress (Count V), negligent infliction of emotional distress (Count VI), and supervisory liability under 42 U.S.C. § 1983 (Count VII). SAC 4–13. In addition to Officers Donnell, Gibson, and Lackee, the Plaintiff has sued two PPD sergeants, Jacob Titcomb and Christopher Dyer; the PPD assistant chief, Vern Malloch; and the City of Portland (the "**City**"). SAC. Count I is asserted against Officers Donnell, Gibson, and Lackee and against Sergeants Titcomb and Dyer. SAC 4. Counts II, V, VI, and VII are asserted against all of the Defendants. SAC 7, 9–10, 12. And Counts III and IV are asserted against all defendants except Assistant Chief Malloch. SAC 8.

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is 'genuine' if the evidence 'is such that a reasonable jury could resolve the point in the favor of the non-moving party' . . . ." *Taite v. Bridgewater State Univ., Bd. of Trs.*, 999 F.3d 86, 93 (1st Cir. 2021) (quoting *Ellis v. Fid. Mgmt. Tr. Co.*, 883 F.3d 1, 7 (1st Cir. 2018)). "[A]nd a fact is 'material' if it 'has the potential of affecting the outcome of the case.' " *Id.* (quoting *Pérez-Cordero v. Wal-Mart P.R., Inc.*, 656 F.3d 19, 25 (1st Cir. 2011)). The moving party bears the initial burden of showing that no such dispute exists, and the nonmoving party must then respond "with sufficient evidence to allow a reasonable jury to find in its favor with respect to each

issue on which it has the burden of proof." *Feliciano-Muñoz v. Rebarber-Ocasio*, 970 F.3d 53, 62 (1st Cir. 2020) (internal quotation marks omitted).

In reviewing a motion for summary judgment, I must view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. *EdgePoint Capital Holdings, LLC v. Apothecare Pharmacy, LLC*, 6 F.4th 50, 57 (1st Cir. 2021). But I am "not obliged either 'to draw unreasonable inferences or credit bald assertions or empty conclusions.'" *Theriault v. Genesis HealthCare LLC*, 890 F.3d 342, 348 (1st Cir. 2018) (quoting *Cabán Hernández v. Philip Morris USA, Inc.*, 486 F.3d 1, 8 (1st Cir. 2007)); *see also Barros-Villahermosa v. United States*, 642 F.3d 56, 58 (1st Cir. 2011) ("Mere allegations, or conjecture unsupported in the record, are insufficient." (internal quotation marks omitted)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). As a result, where a video recording contradicts facts asserted by the nonmoving party, rather than take as true assertions that no reasonable jury could believe, the facts are to be viewed "in the light depicted by the videotape." *Id.* at 380–81.

## DISCUSSION

In seeking summary judgment, the Defendants rely primarily on qualified immunity, which is a potential defense to claims brought against Officers Donnell, Gibson, and Lackee, and against Sergeant Titcomb (the "**Individual Defendants**")

in their individual capacities.[9] *See Kentucky v. Graham*, 473 U.S. 159, 166–67 (1985) (describing that an official sued in his individual capacity can assert various personal immunity defenses, including qualified immunity). Before addressing the liability of the Individual Defendants, I begin with the liability of the City and of Sergeant Dyer and Assistant Chief Malloch (the "**Supervisory Defendants**").

## I.   Municipal Liability

"[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978). Municipal liability only exists where the municipality's policy or custom caused the injury. *Id.* The same analysis controls with respect to the MCRA claim. *Jenness v. Nickerson*, 637 A.2d 1152, 1158 (Me. 1994).

The Defendants contend that the City cannot be liable here under § 1983 or under the MCRA because of a lack of a policy or custom that caused the Plaintiff's asserted injuries. Defs.' Mot. 14–15. And the Defendants also claim that the City is immune from all of the Plaintiffs' tort claims. Defs.' Mot. 18–20.

The Plaintiff offers nothing in response to any of these arguments, nor does he try to defend his claims against the City in any way. The Plaintiff has thus waived his claims against the City. *See Furtado v. Oberg*, 949 F.3d 56, 59 (1st Cir. 2020). The City's motion for summary judgment is **GRANTED**.

---

[9]     It is not clear whether these defendants have also been sued in their official capacities. But a lawsuit against a public official in his/her official capacity is treated as a suit against the government entity because the entity is the real party in interest. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985). Any official capacity claims fail due to a lack of municipal liability, as explained below.

## II.    Supervisory Liability

The Supervisory Defendants are conspicuously missing from the factual background outlined above. That is because nobody disputes that neither was present at the time of Steven's arrest or involved in the arrest or the decision to effectuate it. But the Plaintiff contends that the Supervisory Defendants are responsible for their "subordinates['] deprivation of Steven's constitutionally protected rights." Pl's Opp'n to Defs.' Mot. for Summ. J. ("**Pl.'s Opp'n**") 9 (ECF No. 55).[10]

Section 1983 does not "incorporate doctrines of vicarious liability," *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986), so it must be the case that the Supervisory Defendants are liable in their own right. The Plaintiff contends that they are because they "fail[ed] to provide training sufficient for their officers to understand that a special duty is created when a person is brought into police custody, and by failing to provide adequate training for their officers about how to conduct an arrest in extreme temperatures." Pl.'s Opp'n 9. But the Plaintiff never points to any record evidence as to what the Individual Defendants' training was on these particular topics. He merely assumes that the Individual Defendants received inadequate training and would have responded differently had that not been the case. Without a factual basis to support the theory that the officers were inadequately trained, the

---

[10]     Sergeant Dyer's presence in this case appears to be the result of pure error. He is mentioned in the Second Amended Complaint ("**SAC**") as being involved with Steven's arrest, SAC ¶ 17 (ECF No. 7), but the Plaintiff now concedes that that was not true, DSOF ¶¶ 76, 78. The Plaintiff instead classifies Sergeant Dyer as being a supervisor. Pl's Opp'n 9. Although the Plaintiff offers no evidence that he supervised any of the other defendants in this case, for ease of analysis, I assume that Sergeant Dyer was a supervisor, since he cannot be legally responsible for the actions of any of the officers in this case even if he were.

Supervisory Defendants cannot be liable for the Individual Defendants' actions under § 1983 or under the MCRA, which is analyzed similarly to § 1983. *See Jenness*, 637 A.2d at 1158. Finally, in terms of tort liability, the Defendants argue that the Supervisory Defendants are protected from liability by the discretionary function immunity in Maine Law. Defs.' Mot. 20–21. The Plaintiff does not respond to this argument at all and has thus waived any objection to this contention. *See Furtado*, 949 F.3d at 59. The Supervisory Defendants' motion for summary judgment is therefore **GRANTED**.

## III.   Individual Liability

### A.   Qualified Immunity

#### 1.   Legal Background

"[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.' " *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).[11] The reviewing court has discretion to decide either part of this analysis first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

It is the plaintiff's burden to prove that a defendant is not shielded by qualified immunity, *Escalera-Salgado v. United States*, 911 F.3d 38, 41 (1st Cir. 2018), and it is no easy task. Because qualified immunity is intended to "give[ ] government officials breathing room to make reasonable but mistaken judgments about open legal

---

[11]     Qualified immunity is also a defense to claims brought under the Maine Civil Rights Act. *Clifford v. MaineGeneral Med. Ctr.*, 2014 ME 60, ¶ 46, 91 A.3d 567.

questions[,] . . . it protects 'all but the plainly incompetent or those who knowingly violate the law.' " *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

"The 'clearly established' inquiry itself has two elements." *Castagna v. Jean*, 955 F.3d 211, 219 (1st Cir.), *cert. denied*, 141 S. Ct. 896 (2020). The first focuses on the clarity of the law. *Id.* A right is clearly established only if "existing precedent" puts "the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741. "[P]recedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. *Wesby*, 138 S. Ct. at 590. There need not be "a case directly on point," *al-Kidd*, 563 U.S. at 741, but the right must be "dictated by 'controlling authority' or 'a robust consensus of cases of persuasive authority.' " *Wesby*, 138 S. Ct. at 589–90 (quoting *al-Kidd*, 563 U.S. at 741–42).

"A 'robust consensus' does not require the express agreement of every circuit." *Irish v. Fowler*, 979 F.3d 65, 76 (1st Cir. 2020), *cert. denied*, --- S. Ct. ---, No. 20-1392, 2021 WL 4507655 (2021). "[S]ister circuit law is sufficient to clearly establish a proposition of law when it would provide notice to every reasonable officer that his conduct was unlawful." *Id.* That also means that "[o]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id.* (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). So, "[i]n assessing whether an official's conduct violated clearly established law, [it is] typical[ ] [to] reason by analogy, asking whether there is any prior case in which the [officer's behavior] was

16

deemed unlawful under circumstances reasonably similar to those present in the case at hand." *Escalera-Salgado*, 911 F.3d at 41.

In examining the clarity of the law as to a particular right, the law cannot be defined at too high a level of generality. *Wesby*, 138 S. Ct. at 590. Rather, the legal rule "must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.' " *Id.* (quoting *Saucier v. Katz*, 544 U.S. 194, 202 (2001)). "A rule is too general if the unlawfulness of the officer's conduct 'does not follow immediately from the conclusion that the rule was firmly established.' " *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)).

The second element of the "clearly established" inquiry "focuses on the objective legal reasonableness of an official's acts." *Castagna*, 955 F.3d at 220 (quoting *Eves v. LePage*, 927 F.3d 575, 583 (1st Cir. 2019) (en banc)). This requires a focus "on the facts of the particular case and whether a reasonable defendant would have understood that his conduct violated the plaintiff's constitutional rights." *Penate v. Hanchett*, 944 F.3d 358, 366 (1st Cir. 2019) (quoting *Drumgold v. Callahan*, 707 F.3d 28, 42 (1st Cir. 2013)).

### 2.   Analysis

#### a.   The Second Amended Complaint

I first must examine the scope of the constitutional violation(s) that the Plaintiff pleaded in the SAC. Count I of the SAC is described as an excessive force claim, and the Plaintiff asserts violations of the Fourth and Fourteenth Amendments. Despite his failed attempts to amend the SAC, the Plaintiff contends that the SAC contains "sufficient facts to plead a deprivation of substantive due process rights

17

under the legal theory sometimes called the 'special relationship doctrine.' " Pl.'s Opp'n 2.

Outside of a statement of jurisdiction and a demand for relief, Federal Rule of Civil Procedure 8 only mandates "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). It does not require a perfect "statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014) (per curiam). In fact, the federal rules "mak[e] it clear that it is unnecessary to set out a legal theory for the plaintiff's claim for relief." *Id.* at 12 (quoting 5 C. Wright & A. Miller, Federal Practice and Procedure § 1219, at 277–78 (3d ed. 2004)). Thus, in order for the Plaintiff to be able to pursue his special relationship doctrine theory, he need not have explicitly spelled out that theory in the SAC, so long as he pleaded sufficient facts to support it.

Having said that, while "a complaint need not point to the appropriate statute or law in order to raise a claim for relief under Rule 8, its substance and structure must give the defendants notice of the nature of the claim against them." *Ruivo v. Wells Fargo Bank, N.A.*, 766 F.3d 87, 91 (1st Cir. 2014) (internal quotation marks and citations omitted). "[T]he defendants[ ] are entitled to rely on the plain language and the structure of the complaint in determining what claims are present there." *Id.*

Count I is confusing and is internally inconsistent. But, although it is styled as an "excessive force" claim, the Plaintiff's invocation of "bodily integrity" and the pleaded facts related to the Defendants' inattention to the Plaintiff's feet, SAC ¶¶ 18–22, 36, gave the Defendants sufficient notice that he was pleading two distinct claims

as a part of this one count, an excessive force claim as well as a claim under the special relationship doctrine.

During a Rule 56 Conference held on February 1, 2021, Plaintiff's counsel indicated that he only wished to pursue Count I as a claim under the special relationship doctrine. That is consistent with the Plaintiff's failure to develop any excessive force claim in his opposition to the Defendants' motion for summary judgment. An excessive force claim requires an evaluation of the force that was used in order to assess whether it was reasonable under the circumstances. *Lachance v. Town of Charlton*, 990 F.3d 14, 20 (1st Cir. 2021). In his response to DSOF ¶ 40, the Plaintiff identifies the force that the Defendants purportedly used, but he does not explain how that force was unreasonable.[12] In fact, the one line in his opposition to the motion to suppress that deals with excessive force states only: "While Defendants have argued that their use of force in this case was reasonable, this is based on disputed facts and therefore precludes summary judgment and requires a fact finder to determine whether Defendants [sic] conduct violated Steven's Fourth Amendment rights." Pl's Opp'n 5–6. The Plaintiff discusses his theory only in the context of the special relationship doctrine (a substantive due process doctrine), and he does not develop an excessive force claim (which would arise under the Fourth Amendment rather than the Due Process Clause). Pl.'s Opp'n 2–8. He has thus waived his

---

[12]    This response to DSOF ¶ 40 cites Exhibits 1–3 to the Bennett Affidavit (the Taser Videos) as support for the claim that the police trained a taser on him during the encounter and brought and kept him outside in shorts, a shirt, and socks. Pl.'s Resp. to DSOF ¶ 40. But the Plaintiff does nothing to explain how that level of force was unconstitutional under the circumstances. And some of his claims as to force, such as that he was prevented from sitting in the ambulance, are contradicted by the video evidence.

excessive force claim. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

The Plaintiff also argues that he has pleaded an unreasonable seizure claim under the Fourth Amendment. It is difficult to understand what the basis for this claim is because the Plaintiff does not explain whether he is complaining about the fact of his seizure (i.e., that the arrest was unreasonable), or the manner of it. But neither can support a viable claim. The former is beyond the scope of the SAC because the Plaintiff never alleged that he was improperly arrested, and he cannot make that argument for the first time now. And, as for the latter, this argument is only made in the context of the Plaintiff's special relationship doctrine claim and thus must be pursued under the Due Process Clause (i.e., a Fourteenth Amendment claim), not the Fourth Amendment.

At bottom, the only constitutional claim that the Plaintiff has both pleaded and preserved is his substantive due process claim under the special relationship doctrine.[13]

### b.   The Special Relationship Doctrine

The Supreme Court has said that "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-

---

[13]   The Defendants also surmised that the Plaintiff may have brought a claim based on a failure to provide him with medical care, and they thus sought summary judgment on such a claim. Defs.' Mot. for Summ. J. 5–7 (ECF No. 53). However, the Plaintiff has made clear that he is not pursuing such a claim. Pl.'s Opp'n 8.

being." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989). In other words, "when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause." *Id.* at 200.

Even where there exists such a special relationship, to prove a substantive due process violation, the plaintiff must prove that the state action shocks the conscience. *Rivera v. Rhode Island*, 402 F.3d 27, 35 (1st Cir. 2005); *see also Martínez v. Cui*, 608 F.3d 54, 64 (1st Cir. 2010) (concluding that the "shocks-the-conscience" test "governs *all* substantive due process claims based on executive . . . action"). The "shocks-the-conscience" standard requires an evaluation of "whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998). "In order to shock the conscience, the conduct must be 'truly outrageous, uncivilized, and intolerable.'" *McConkie v. Nichols*, 446 F.3d 258, 260 (1st Cir. 2006) (quoting *Hasenfus v. LaJeunesse*, 175 F.3d 68, 72 (1st Cir. 1999)).

"[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Lewis*, 523 U.S. at 849. Although the assessment is more difficult for conduct that is not intentional, deliberately indifferent behavior can also shock the conscience. *Id.* at 849–52. A plaintiff can establish conscience-shocking deliberate

21

indifference by showing that the state actor "knew of a substantial risk of serious harm and disregarded that risk" in a situation where the state actor had the opportunity to make an unhurried judgment. *Irish*, 979 F.3d at 75. Deliberate indifference is most pronounced "where the state official performs multiple acts of indifference" that collectively create a "risk of acute and severe danger." *Id.* Whether behavior is conscience-shocking depends heavily on the individual circumstances in a particular case. *Rivera*, 402 F.3d at 36.

As the Defendants acknowledge, the First Circuit has long recognized the existence of the special relationship doctrine in a general sense. Defs.' Mot. 8–9. It is apparent that Steven was in the custody of law enforcement, and, in taking him into their custody, at least some of the Defendants[14] assumed a duty to care for Steven's safety and general well-being. The Plaintiff argues that this duty included protection from "unnecessary exposure to dangerously low temperatures." Pl.'s Opp'n 10.

I need not decide, however, whether the Defendants' actions violated the Plaintiff's constitutional rights or whether existing precedent puts the constitutional right beyond debate.[15] I focus instead on the second prong of the "clearly established"

---

[14]   I need not decide the more difficult question of who exactly owed this duty, and I assume that this duty was shared by all of the Defendants present at the residence. Although not all of the Defendants were so present, I refer to the Defendants collectively as shorthand.

[15]   I doubt whether the state of the law in December 2017 was as clearly established as the Plaintiff contends. I note that the cases cited by the Plaintiff are distinguishable both factually and legally. Only two involve an individual outside in the cold during a police encounter. *See Ellington v. Cnty. of Monroe*, Case # 15-CV-6310-FPG, 2018 WL 6605662, at *1–2 (W.D.N.Y. Dec. 17, 2018) (plaintiff suffered frostbite after running and hiding from police in cold weather for forty-five minutes), *appeal dismissed for lack of jurisdiction*, *Ellington v. Whiting*, 807 F. App'x 67 (2d Cir. 2020) (summary order); *Riordan v. City of Joliet*, 3 F. Supp. 2d 889, 892–93 (N.D. Ill. 1998) (heavily intoxicated plaintiff wandered off and developed hypothermia and frostbite after officers left him outside police station in extreme cold). And in terms of the legal principles analyzed in the Plaintiff's cited cases, only *Riordan* involved a substantive due process claim. 3 F. Supp. 2d at 891. But even *Riordan* is inapt, because it

element of qualified immunity, that is, whether under the specific, undisputed facts of this case, a reasonable officer would have understood that his or her conduct violated the Plaintiff's constitutional rights.

Viewing the facts (when not otherwise contradicted by the video recordings) in the light most favorable to the Plaintiff, the situation to which the police responded on the night in question was a volatile one. It was the officers' obligation to investigate the allegations about the altercation and to protect the complainants. The decision to remove Steven from the house in the first instance was a direct response to Steven's refusal to comply with objectively reasonable commands made to ensure the safety of the officers and complainants.

---

is a state-created danger case, *see id.* at 894–95 & n.7 (explaining that plaintiff's claim was based on what happened after he was *released* from custody, not on the "significantly more intensive and extended custodial deprivations of liberty" discussed in *DeShaney*), not a special relationship one. *See Irish v. Fowler*, 979 F.3d 65, 73–75 (1st Cir. 2020) (explaining components of a state-created danger claim). Meanwhile, the other nine cases cited by the Plaintiff involve an asserted Eighth Amendment violation, s*ee Burley v. Miller*, 241 F. Supp. 3d 828, 831 (E.D. Mich. 2017); or alleged Fourth Amendment violations involving illegally obtained evidence, s*ee United States v. Nascimento*, 491 F.3d 25, 50 (1st Cir. 2007) (finding that "dignity and the New England climate" created an exigency that allowed officers to enter another room to obtain clothes for partially clothed defendant), *United States v. Gwinn*, 219 F.3d 326, 330–31, 333 (4th Cir. 2000) (concluding that "arrestee's partially clothed status . . . constitute[d] an exigency"); excessive force, *see Ellington*, 2018 WL 6605662, at *3 (tight handcuffs, an "aggressive arrest," and a dog bite), *Burchett v. Kiefer*, 310 F.3d 937, 945 (6th Cir. 2002) (defendant detained for three hours in hot car), *Wilcomb v. City of Houston*, Civil Action H-17-1866, 2018 WL 925081, at *4–5 (S.D. Tex. Feb. 16, 2018) (defendant kept for eighty minutes in extreme heat); and unjustified nudity during a seizure, *see Hall v. Shipley*, 932 F.2d 1147, 1150 (6th Cir. 1991) (plaintiff alleged that officers' insistence that he remain naked while his home was searched violated his Fourth Amendment rights), *Amato v. Steele*, Civil Action No. 13-cv-13094-IT, 2015 WL 3466395, at *4–5 (D. Mass. June 1, 2015) (finding potential violation of clearly established Fourth Amendment "right to be free from unjustified nudity during a seizure"), *Hutchinson v. W. Va. State Police*, 731 F. Supp. 2d 521, 539–44 (S.D.W. Va. 2010) (analyzing prolonged forced nakedness in context of Fourth Amendment). These rights involve different analyses than is required for a substantive due process claim. *Compare Staples v. Gerry*, 923 F.3d 7, 13 (1st Cir. 2019) (Eighth Amendment standard), *and Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) ("[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness' . . . ."), *with Rivera v. Rhode Island*, 402 F.3d 27, 33–36 (1st Cir. 2005) (outlining substantive due process standard in context of special relationship doctrine).

Once outside, it is clear that Steven remained belligerent and, at times, was threatening and aggressive. And while his aggression waxed and waned throughout the encounter, the recordings demonstrate that even after he was seen by the paramedic, he tried to push past officers and return to the house. As a large, irrational man, he posed a risk to the officers even after they were able to secure him in handcuffs.

I take the Plaintiff's point that the officers should have suspected that Steven was mentally unwell given that his son described recent mental health issues and given that he had hit his head and been drinking. But it is clear that the police were trying to attend to Steven's need for protection from the elements. According to the undisputed facts, within a minute of Steven stepping outside, the officers offered to get him footwear. And, as corroborated by video evidence, the paramedic, Officer Donnell, and Officer Gibson offered him shoes on at least nine occasions over the twenty-six minutes he was outside, and Steven ignored or rejected each of those offers. At one point, the officers actually brought shoes to Steven, and he still refused them. While he now claims that the shoes he was offered were three sizes too small, this is not included in the PSOF, and the recordings do not reflect that he ever told the officers that the shoes did not fit him or that he needed other shoes. Additionally, the Plaintiff does not effectively dispute that the police did not feel they could safely force Steven to put on shoes.

The Plaintiff contends that the officers should have brought him back inside the residence, but he ignores any of the problems that such a course of action would

have created. The Defendants contend that bringing Steven inside would have created a safety concern due to the presence of Gwendolyn and Mitchell, with whom Steven had just been involved in a violent confrontation. The Plaintiff denies he posed any threat, but, based on the undisputed facts, it was reasonable for the officers to have taken these concerns into account.

The Plaintiff proposes that any risks of bringing Steven back inside the residence could have been mitigated by a security sweep or by handcuffing him. Pl.'s Resp. to DSOF ¶ 53. He offers no evidence that a security sweep could have been performed any more quickly than the time it took for the arrest wagon to arrive.[16] It was also reasonable for the officers to disregard the possibility of bringing Steven back into the house after he was handcuffed. Given Steven's size and his level of belligerence, it was reasonable for the officers to think it would have been more difficult to maintain control of the situation had they brought him inside the house, even if he were handcuffed.

Similarly, the Plaintiff contends that he should have been put into one of the cruisers that was on the scene to keep warm. The Plaintiff disputes that he was too large to fit in a cruiser and he generally contends that he was not acting in an aggressive or threatening manner. Taking the facts in the light most favorable to the Plaintiff, he could have physically fit into the back of the cruiser. But I do not credit the Plaintiff's self-serving assertion contradicted by the video recordings that he was

---

[16]     For example, the Plaintiff identifies no evidence in the record as to how long a security sweep typically takes or how large the residence was.

not being aggressive and threatening. The concerns by the police about putting Steven into one of the cruisers because of his demeanor and aggressive attitude were well-founded.

The police are not required in these circumstances to choose the ideal course of action, and, in this case, the officers' options were limited. They moved a non-compliant, suspected perpetrator of domestic violence who was acting in an indisputably aggressive and threatening manner towards law enforcement out of his house and away from a potential victim and a potential witness. They then tried unsuccessfully to convince him to don footwear and use other "stuff" to keep him warm. While the length of time that the Plaintiff remained outside without footwear is troubling, on this record there is no factual support for the claim that the police had any viable options that would have kept Steven from being held outside any longer than necessary. And the blame for the circumstances and the length of time that Steven was outside does not fall on the police.

Because I find that the actions taken by the police in the unique circumstances of this case were objectively, legally reasonable, and because I conclude that a reasonable officer would not have understood that his or her conduct violated the Plaintiff's constitutional rights (even assuming such a violation occurred), I find that the Plaintiff has not met his burden of proving that the Defendants should not be shielded by qualified immunity. The Individual Defendants are entitled to qualified immunity on both Count I (the constitutional claim) and Count II (the MCRA claim).

### B.     The Tort Claims

The Individual Defendants contend that they are immune from the Plaintiff's tort claims under subsection 1(C) of 14 M.R.S. § 8111. Defs.' Mot. 20–21. That part of the statute provides that government employees are absolutely immune from personal civil liability as a result of "[p]erforming or failing to perform any discretionary function or duty." 14 M.R.S. § 8111(1)(C). The Plaintiff does not directly respond to this argument and instead contends that the Defendants are not immune under *another* part of the statute, subsection 1(E), which establishes immunity for intentional torts not performed in bad faith. But even accepting the Plaintiff's argument that the Defendants are not immune under subsection 1(E), that says nothing about the Defendants' immunity under subsection 1(C). Each of these grants of immunity is independent from one another. *See* 14 M.R.S. § 8111(1) (separating each category by the disjunctive "or"). And while the Plaintiff argues that the Defendants acted in bad faith, a finding of bad faith does not erase a governmental employee's discretionary function immunity. *See Grossman v. Richards*, 722 A.2d 371, 374–75, 1999 ME 9, ¶¶ 9–13 (1999). Because the Plaintiff does not challenge the Defendants' assertion that discretionary function immunity applies here, any argument to the contrary is waived. *See Furtado*, 949 F.3d at 59. Summary judgment for the Defendants as to all of the Plaintiff's tort claims is warranted.

Finally, the Defendants also seek summary judgment on the issue of punitive damages, but because I find that there is no contestable issue of liability, the issue of punitive damages is moot.

## CONCLUSION

For the reasons stated above, the Court **GRANTS** the Defendants' motion for summary judgment (ECF No. 53).

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 16th day of November, 2021.